**UNITED STATES DISTRICT COURT**
**FOR THE NORTHER DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| JEREMY MAYORAL | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) Case No. 1:24-cv-04699 |
| | ) |
| McGRATH CITY HYUNDAI, INC., | ) |
| ETHOS GROUP COMPLIANCE | ) |
| SOLUTIONS, McGRATH AUTOMOTIVE, | ) |
| INC. and KEVIN CURTIS | ) |
| | ) |
| Defendant. | ) |
| | ) |

**DEFENDANT, KEVIN CURTIS'**
**ANSWER AND AFFIRMATIVE DEFENSES TO COMPLAINT**

NOW COMES Defendant, Kevin Curtis ("Curtis") by and through his attorneys, Litchfield Cavo, LLP, and state as and for an Answer to Plaintiff's Complaint as follows:

**PARTIES**

1.      Plaintiff is a resident of this judicial district.

**ANSWER:**  Defendant lacks knowledge sufficient to form a belief as to the truth of the allegations contained in Paragraph 1 and therefore, can neither admit nor deny the allegations.

2.      Plaintiff's race is Native American and Hispanic.

**ANSWER:**  Defendant lacks knowledge sufficient to form a belief as to the truth of the allegations contained in Paragraph 2 and therefore, can neither admit nor deny the allegations.

3.      Plaintiff is over the age of forty.

**ANSWER:**  Defendant lacks knowledge sufficient to form a belief as to the truth of the allegations contained in Paragraph 3 and therefore, can neither admit nor deny the allegations.

4.   At all times material to this Complaint, Defendant had knowledge of Plaintiff's race and age.

**ANSWER:**  Defendant admits only that McGrath City had knowledge of Plaintiffs age based upon the employment materials he submitted and denies the remaining allegations contained in Paragraph 4.

5.      Defendant MCH is an Illinois corporation and a resident of this judicial district.

**ANSWER:** Defendant lacks knowledge sufficient to form a belief as to the truth of the allegations contained in Paragraph 5 and therefore, can neither admit nor deny the allegations.

6.     Defendant MCH is the entity operating an automobile dealership, located at 6750 W. Grand Ave., Chicago, IL 60707 (the "McGrath City Hyundai Dealership").

**ANSWER:** Defendant lacks knowledge sufficient to form a belief as to the truth of the allegations contained in Paragraph 6 and therefore, can neither admit nor deny the allegations.

7.     Defendant MCGRATH is an Illinois corporation and a resident of this judicial district.

**ANSWER:** Defendant lacks knowledge sufficient to form a belief as to the truth of the allegations contained in Paragraph 7 and therefore, can neither admit nor deny the allegations.

8.     Defendant MCGRATH is the Owner of MCH and exercises direct control over the operations and staffing of MCH.

**ANSWER:** Defendant lacks knowledge sufficient to form a belief as to the truth of the allegations contained in Paragraph 8 and therefore, can neither admit nor deny the allegations.

9.     Defendant ETHOS is a Texas limited liability corporation doing business in this judicial district.

**ANSWER:** Defendant lacks knowledge sufficient to form a belief as to the truth of the allegations contained in Paragraph 9 and therefore, can neither admit nor deny the allegations.

10.     Defendant Kevin Curtis is a resident of this judicial district.

**ANSWER:** Answering paragraph 10, Defendant admits.

**JUDISDICTION, VENUE, EXHAUSTION OF ADMINISTRATIVE REMINDERS**

11.     This Court has original jurisdiction pursuant to 28 U.S.C. §1331 over the retaliation claim arising under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e, et seq., ("Title VII").

**ANSWER:** Defendant lacks knowledge sufficient to form a belief as to the truth of the allegations contained in Paragraph 11 and therefore, can neither admit nor deny the allegations.

12.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367.

**ANSWER:** Defendant lacks knowledge sufficient to form a belief as to the truth of the allegations contained in Paragraph 12 and therefore, can neither admit nor deny the allegations.

13.     Plaintiff exhausted his administrative remedies and these claims are properly before this Court.

**ANSWER:**  Defendant admits that Plaintiff obtained a right to sue from the Equal Employment Opportunities Commission and denies any further allegations contained in Paragraph 13.

14.     Venue is properly placed in this District because the Defendants, at all relevant times, transacted business in this District and because a substantial part of the events or omissions giving rise to the claim occurred in this District pursuant to 28 U.S.C. §1391(b)(2) and (3).

**ANSWER:**  Defendant lacks knowledge sufficient to form a belief as to the truth of the allegations contained in Paragraph 14 and therefore, can neither admit nor deny the allegations.

## FACTS

15.     On or about October 1, 2023, Defendants hired Plaintiff as a General Sales Manager at MCH.

**ANSWER:**  Defendant admits only that Plaintiff was hired by McGrath City as a General Sales Manager in October of 2022 and denies and further allegations contained in Paragraph 15.

16.     At all times material to this Complaint, Plaintiff was qualified for the position of General Sales Manager.

**ANSWER:**  Defendant admits only that McGrath City believed Plaintiff was qualified for the position of General Sales Manager when it hired him in October of 2022 and denies any further allegations contained in Paragraph 16.

17.     Plaintiff was supervised by Defendant Curtis, General Manager for MCH.

**ANSWER:**  Defendant admits only that he was Plaintiffs immediate supervisor at McGrath City.

18.     During Plaintiff's employment with Defendants the following individuals were employed by Defendants or were otherwise agents acting on behalf of Defendants in the following positions:

  a.   Kevin McGrath - President
  b.   Dan Hunt – CFO
  c.   Fatten Haddad - HR Manager
  d.   Brian Chlada - Controller/Office Manager
  e.   Ron Blum - Service/Sales Director
  f.   Chris Caperelli - Service Manager
  g.   Defendant Curtis - General Manager
  h.   Plaintiff Jeremy Mayoral - General Sales Manager
  i.   Joe Curti - New Car Manager
  j.   Jon Chung - Used Car Manager

3

k.  Jorgina Beto - Finance Manager
l.  Matt Montanez - Finance Manager
m.  Baha Yergashev - Finance Manager
n.  Roger Clegg - Inventory Manager
o.  Jaden Miranda - BDC Manager
p.  Miguel Caro – Sales Manager
q.  Michael Richardson – Sales
r.  Michael Vaughn – Sales

**ANSWER:**  Defendant admits only that the individuals identified by Plaintiff in paragraphs c

through r worked at McGrath City at various times and denies any further allegations contained in Paragraph

18.

19.  At all times material to this Complaint, Plaintiff performed to the legitimate employment
expectations of Defendants.

**ANSWER:**  Answering paragraph 19, Defendant denies.

20.  Plaintiff never received any disciplinary action for misconduct or performance from
Defendant prior to his termination on February 6, 2023.

**ANSWER:**  Answering paragraph 20, Defendant denies.

21.  Plaintiff was in fact praised for his performance on more than one occasion by Defendant
Curtis.

**ANSWER:**  Answering paragraph 21, Defendant denies.

## A.  Defendant' Unlawful Activities

### _Unauthorized and Deceptive Add-on Charges_

22.  In the course of promoting, advertising, marketing, selling, leasing, or financing vehicles,
in addition to charging consumers for the vehicles themselves, Defendants charged consumers for
additional products and services ("add-on" or "add-on products"), such as service contracts, GAP insurance,
or paint protection.  Add-on charges can range from a hundred dollars to well over several thousands of
dollars, substantially increasing the cost of a vehicle-and Defendants' profits on a sale.

**ANSWER:**  Defendant admits only that in addition to vehicle sales McGrath City sold additional

products and services and denies any further allegations contained in Paragraph 22.

23.  In many instances, Defendants tacked on charges for add-ons in consumers' contracts
without the consumers' informed consent.  In other instances, Defendants mention add-ons, but falsely told
consumers they are mandatory.

**ANSWER:**  Defendant denies the allegations contained in Paragraph 23.

24.     Further, Defendants had a discretionary unwritten policy that permits its employees to mark up interest rates and tack on charges for add-on products, resulting in higher costs to Black and Latino applicants than similarly-situated non-Latino White applicants.

**ANSWER:** Defendant denies the allegations contained in Paragraph 24.

25.     Defendants frequently lured consumers into their dealerships with low advertised prices. Consumers who call to confirm advertised prices are told that there will be no fees beyond "routine taxes and fees". Many consumers drove hours to the dealerships based on the advertised prices.

**ANSWER:** To the extent Paragraph 25 contains any allegations against the Defendant they are denied.

26.     At the dealership, consumers frequently spent time test driving and selecting a vehicle, and then went through the long process of negotiating the price of the vehicle. After that, for consumers who were financing vehicles, there was often a lengthy discussion of the financing terms. After an often hours-long process, Defendants presented consumers with a stack of complex, highly technical documents. Defendants then rushed consumers through the closing process, which typically required executing paperwork exceeded 60 pages and over a dozen signatures by simply indicating where to sign without explaining any of the terms of the financing.

**ANSWER:** To the extent Paragraph 26 contains any allegations against the Defendant they are denied.

27.     In numerous instances, Defendants inserted charges for add-on products in these documents without obtaining consumers' express informed consent. These charges commonly amounted to hundreds or thousands of dollars and are typically added to the amount financed and spread out over monthly payments, making the added charges more difficult to detect.

**ANSWER:** Defendant denies the allegations contained in Paragraph 27.

28.     In other instances, also after consumers had been at a dealership for hours, Defendants falsely told consumers that add-on products or packages are required to purchase or finance the vehicle, even though they were not included in the low prices advertised or disclosed to consumers who called to confirm prices.

**ANSWER:** Defendant denies the allegations contained in Paragraph 28.

29.     If consumers asked to have these extra charges removed, stating that they do not want to purchase add-ons, Defendants falsely tell the consumers that the add-ons are not optional.

**ANSWER:** Defendant denies the allegations contained in Paragraph 29.

30.     MCH told consumers that these add-ons (as well as Service Contracts and GAP insurance) are mandatory to purchase the vehicle. MCH will also lower interest rates to "slide in" certain add-ons so that the consumer will not notice. These "junk fees" were included in more than 90% of all transactions at the MCH and on information or belief continue to be included in Defendant's transactions.

**ANSWER:** To the extent Paragraph 30 contains any allegations against the Defendant they are denied.

31. Upon information and belief, MCGRATH engages in this conduct at all of its dealerships, including at MCGRATH's Honda and Mazda dealerships, which are on adjacent lots to MCH.

**ANSWER:** To the extent Paragraph 31 contains any allegations against the Defendant they are denied.

32. Defendants charged thousands of consumers hundreds to thousands of dollars for such unauthorized, unwanted add-ons, amounting to millions of dollars in deceptive charges and profits to Defendant.

**ANSWER:** To the extent Paragraph 32 contains any allegations against the Defendant they are denied.

**B.      Defendants Charged Consumers without Their Consent**

33. Defendants charged thousands of consumers hundreds to thousands of dollars for such unauthorized, unwanted add-ons, amounting to millions of dollars in deceptive charges and profits to Defendants.

**ANSWER:** Defendant denies the allegations contained in Paragraph 33.

34. In numerous instances, Defendants have charged consumers for add-on packages that the consumers never agreed to purchase-and, in some cases, specifically declined-with the unauthorized charges buried in a mountain of paperwork and rolled into the financing of the vehicle.

**ANSWER:** Defendant denies the allegations contained in Paragraph 34.

35. For example, one consumer agreed to a total price for a vehicle at MCH, prior to the down payment being applied. The consumer later discovered, however, that that MCH took the consumer's $8,000 down payment and tacked on add-on charges of roughly the same amount without the consumer's consent or knowledge. Thus, the consumer's down payment only covered the cost of the unauthorized charges, and he still owed the full cost of the vehicle.

**ANSWER:** To the extent Paragraph 35 contains any allegations against the Defendant they are denied.

36. Many consumers complained about Defendants' practice of charging for multiple add-ons without authorization. For example, one consumer complained that MCH added multiple add-on products to the sales contract without authorization. The customer e-mailed MCH and asked to "understand what Ethos Gap is and why it's charging a huge price of $8772.60."

**ANSWER:** To the extent Paragraph 36 contains any allegations against the Defendant they are denied.

37.     In response, MCH sent the consumer the sales contract without comment.  After a complaint was filed, MCH acknowledged that the consumer had been charged for several add-on products and refused to refund the consumer for those deemed "not cancellable", despite the fact that the consumer had never authorized it.

**ANSWER:**  To the extent Paragraph 37 contains any allegations against the Defendant they are

denied.

38.     In some instances, Defendants have charged consumers for add-ons that they told the consumers were free.  For example, one consumer was told that two oil changes, a tire rotation and windshield protection came with the purchase of the vehicle.  He lived far from the dealership and was unlikely to have his car serviced there and would never have paid for windshield protection because it was already covered by his insurance.  He also initially declined an extended warranty as far too expensive, but then ultimately agreed when offered a discounted price.  He later discovered he had been charged $426 for oil changes, tire rotation and windshield protection, despite Defendants' representations that they were "free", and that he was charged the full amount for the extended warranty (i.e., without the promised discount).  He tried calling the dealership multiple times to cancel the add-ons and request refunds, but his calls went unreturned.  He eventually had to contact the warranty add-on provider (Defendant ETHOS) directly to request a cancellation of the warranty.

**ANSWER:**  To the extent Paragraph 38 contains any allegations against the Defendant they are

denied.

39.     In other instances, Defendants have charged consumers for add-on products that consumers have specifically declined.  One consumer said that MCH inserted a maintenance package onto his invoice even after he told them that he did not want it.

**ANSWER:** To the extent Paragraph 39 contains any allegations against the Defendant they are

denied.

40.     Another consumer said that he told the sales representative that he did not want Ethos GAP insurance, Corporate Defendants added it on his invoice anyway, which he only discovered after he left the dealership and executed the financing documents.

**ANSWER:**  To the extent Paragraph 40 contains any allegations against the Defendant they are

denied.

**C.     Defendants Falsely Claim that Add-ons Are Mandatory**

41.     In numerous instances, Defendants told consumers that the purchase of add-on products were required to purchase or finance a vehicle, purportedly due to dealership or finance company policy. In actuality, add-on products are not required by the Defendants' dealerships or by financing companies. When consumers ask to have charges for add-on products that they do not want removed, or to purchase the vehicle at the advertised price without additional charges for add-ons, in numerous instances, they are falsely told that these extra charges are not optional and consumers are therefore unable to purchase vehicles at the advertised prices.

**ANSWER:** To the extent Paragraph 41 contains any allegations against the Defendant they are denied.

42. MCH has several add-on items that are not included in any advertised online pricing. These include, but not limited to:

- McGrath Package - ranging from $795 - $19,995;
- Shipping & Handling - ranging from $995 - $2495;
- Certification - ranging from $995 - $4995; and,
- Used Car Inspection - ranging from $995 - $4995.

**ANSWER:** To the extent Paragraph 42 contains any allegations against the Defendant they are denied.

43. Again, MCH told consumers that these add-ons (as well as Service Contracts and Ethos GAP insurance) are mandatory to purchase the vehicle. MCH also lowered interest rates to "slide in" certain add-ons so that the consumer will not notice.

**ANSWER:** To the extent Paragraph 43 contains any allegations against the Defendant they are denied.

44. For example, a consumer noted that the listed final price on MCH's website for a particular car, and he confirmed this was the price before driving more than three hours to the dealership to see it. When he arrived, he was told that he would need to pay a higher price for the vehicle than the price listed on the website because a McGrath add-on package totaling more than $2,500 was required. The consumer was not permitted to purchase the vehicle at the advertised price without paying more for the McGrath package.

**ANSWER:** To the extent Paragraph 44 contains any allegations against the Defendant they are denied.

45. Another consumer went to look at a vehicle that was advertised online for a set price, only to be told at the dealership that he would have to pay an additional $1,300 for an add-on package. In a later call, the dealership again told him that purchasing the add-on package was required, despite the online advertisement that the car was available for the set price. After additional interactions, during which the consumer spent additional time trying to get the vehicle for the advertised price, a salesman said that the consumer was still required to take the package. After substantial pushback from the consumer, the salesman eventually agreed to offset the cost of the package in the price of the vehicle, though this "concession" by the sales representative limited the consumer's ability to negotiate the price of the vehicle further, as he otherwise would have done.

**ANSWER:** To the extent Paragraph 45 contains any allegations against the Defendant they are denied.

46. In another instance, a consumer noticed during his negotiations with MCH that his purchase price was nearly $1,000 higher than expected. Only after the consumer pointed out the additional

charge did the salesman inform him that he was being charged for an add-on package. The consumer said that he was not interested in purchasing the add-on package, but the salesman said he could not remove it. After some debate, the consumer asked if he could at least remove some of the add-ons in the package. The salesman said he could not, stating that the full package was required.

**ANSWER:** To the extent Paragraph 46 contains any allegations against the Defendant they are

denied.

47.     Similarly, MCH and Ethos included multiple add-ons, totaling over $1,000, on a consumer's contract without obtaining the consumer's authorization. These included a maintenance plan that the consumer did not want, as the dealership was too far away for him to travel for routine maintenance. When the consumer requested that the add-ons be removed prior to signing, the consumer was told they were required and could not be removed.

**ANSWER:** To the extent Paragraph 47 contains any allegations against the Defendant they are

denied.

48.     In another instance, a salesman at MCH told a consumer that a particular add-on - specifically, another ETHOS Gap insurance policy - was required for the financing company to approve his loan. The consumer later found out from the financing company that the add-on was not required.

**ANSWER:** To the extent Paragraph 48 contains any allegations against the Defendant they are

denied.

49.     Similarly, a consumer was told by another MCH salesman that add-ons totaling more than $2,000 were required by the financing company to get his financing approved, only to be told later by the financing company that this was incorrect.

**ANSWER:** To the extent Paragraph 49 contains any allegations against the Defendant they are

denied.

50.     As a result of such conduct, in many instances, consumers have reported being out hundreds, and often, thousands of dollars for unwanted or unauthorized add-on products.

**ANSWER:** To the extent Paragraph 50 contains any allegations against the Defendant they are

denied.

51.     In another instance, a consumer questioned an $8,000+ add-on for "ETHOS Gap."

**ANSWER:** To the extent Paragraph 51 contains any allegations against the Defendant they are

denied.

52.     The finance manager who worked with the consumer never properly explained any of the charges to this customer. Rather, the consumer recalls being rushed and told that the contract terms were "standard."

9

**ANSWER:** To the extent Paragraph 52 contains any factual allegations against the Defendant they are denied.

53. Moreover, the finance manager never gave the consumer a copy of his Retail Installment Contract.

**ANSWER:** To the extent Paragraph 53 contains any factual allegations against the Defendant they are denied.

54. After receiving the contract days later, the consumer e-mailed the finance manager stating that he "would like to understand what ETHOS Gap is and why its charging a huge price of $8,772.60 ... Could you please help me with that?"

**ANSWER:** To the extent Paragraph 54 contains any factual allegations against the Defendant they are denied.

55. In response, the finance manager wrote that he would "get the deal and rescan you everything." Instead, the finance manager sent the same contract that the consumer was already referencing.

**ANSWER:** To the extent Paragraph 55 contains any factual allegations against the Defendant they are denied.

56. The consumer in question then stated that "you have already sent me the contract copy, I have a few questions related to the ETHOS Gap contract and I would like to talk to you regarding that."

**ANSWER:** To the extent Paragraph 56 contains any factual allegations against the Defendant they are denied.

57. Having not heard back from the finance manager, the consumer again wrote him stating "I'm trying really hard to reach out to you. I tried reaching you through emails, phone calls and also sent a voicemail in the last four days. I need some help from you in canceling the ETHOS Gap contract. Could you please help me with that?"

**ANSWER:** To the extent Paragraph 57 contains any factual allegations against the Defendant they are denied.

58. Ultimately, the finance manager claimed he was "out sick" - which was not the case - and passed the consumer to another finance manager who attempted to convince the consumer that the add-ons were standard and could not be removed without sacrificing the financing.

**ANSWER:** To the extent Paragraph 58 contains any factual allegations against the Defendant they are denied.

59.     The consumer could not understand why a lower total price would negatively impact his financing and escalated the issue to another manager who reluctantly canceled all the products that were added-on without the consumer's knowledge or understanding.

**ANSWER:**  To the extent Paragraph 59 contains any factual allegations against the Defendant they

are denied.

60.     Most MCH consumers are not as fortunate and if they ever do notice the add-ons or irregularities with the deal, are unable to obtain refunds or only receive partial refunds, regardless of whether the charges have been authorized.

**ANSWER:**  To the extent Paragraph 60 contains any allegations against the Defendant they are

denied.

61.     Upon information and belief, MCH consumers do not notice the add-ons because they are strategically hidden in the applicable deal.

**ANSWER:**  To the extent Paragraph 61 contains any allegations against the Defendant they are

denied.

62.     MCH refused to show additional add-ons in their "low online pricing."

**ANSWER:**  To the extent Paragraph 62 contains any allegations against the Defendant they are

denied.

63.     MCH told the consumer that there is not a "Market Adjustment" for pricing when in fact, there often is.

**ANSWER:**  To the extent Paragraph 63 contains any allegations against the Defendant they are

denied.

64.     On numerous occasions, MCH has inserted extra add-ons without the customer's consent and hid the extra charges in the monthly payments, where it is difficult to detect.

**ANSWER:**  To the extent Paragraph 64 contains any allegations against the Defendant they are

denied.

65.     MCH has even gone to extreme measures; where they will fraudulently sign documents, including retail installment contracts and buyer's orders, to avoid disclosing these extra add-ons to consumers.

**ANSWER:**  To the extent Paragraph 65 contains any allegations against the Defendant they are

denied.

66. Defendant received consumer complaints that employees at these dealerships pack in add-on charges without consumers' consent, yet they have failed to correct these issues.

**ANSWER:** To the extent Paragraph 66 contains any allegations against the Defendant they are denied.

**D.** **Defendant's Improper Manipulation of Destination and Delivery Charge**

67. MCH also regularly engages in unethical practices regarding delivery and destination fees. A destination fee is a charge for delivering a new car from the factory to its point of sale.

**ANSWER:** To the extent Paragraph 67 contains any allegations against the Defendant they are denied.

68. Hyundai charged a destination fee of $1,295.

**ANSWER:** Defendant lacks knowledge sufficient to form a belief as to the truth of the allegations contained in Paragraph 68 and therefore, can neither admit nor deny the allegations.

69. MCH charged a $1,870 shipping and handling fee in addition to the $1,295 that Hyundai already charged on the original window sticker.

**ANSWER:** Defendant lacks knowledge sufficient to form a belief as to the truth of the allegations contained in Paragraph 69 and therefore, can neither admit nor deny the allegations.

70. Many consumers have no idea that this double charging has occurred and sales personnel are encouraged to obfuscate the reasoning behind the added charge to the best of their ability based on the situation and the savviness of the customer.

**ANSWER:** To the extent Paragraph 70 contains any allegations against the Defendant they are denied.

**E.** **Defendant's Deceptive Used Car Sales Practices**

71. MCH also engaged in unethical practices relating to the "certification" of used cars.

**ANSWER:** To the extent Paragraph 71 contains any allegations against the Defendant they are denied.

72. Defendants operate a "Certified Used Vehicle" program in which they advertise and sell used cars based on Hyundai's certification program.

**ANSWER:** Defendant admits only that McGrath City sold used cars and denies any further allegations contained in Paragraph 72.

73.     Hyundai's Certified Used Vehicles program states that it comes with a 173-Point Inspection, an industry-leading 10-year/100,000-mile warranty from first sale, a free CARFAX® report and more.

**ANSWER:**  Defendant admits only that McGrath City sold used cars and denies any further allegations contained in Paragraph 73.

74.     Used cars can be certified or not certified. Certified used cars demand higher prices than non-certified used cars.  This is because MCH presents cars as "certified" and charges an average of $3,795 for the certification on used vehicles.  However, many of these "certified" used cars do not go through the "certification process" and the certified junk fees are included nonetheless.

**ANSWER:**  Defendant admits only that McGrath City sells used cars and denies any further allegations contained in Paragraph 74.

75.     The topic of whether the customer wants the used car "certified" typically comes up after the customer has already agreed in principle to the price and sale of the car.  The car is then held-out as "already certified" and, thus, MCH claims a certification charge must be included or the car is held out as "able to be certified" and, thus, MCH claims it can have the car certified for a certain sum.  In both cases, the cars are sold with higher "certified" prices even though the cars are not certified.

**ANSWER:**  To the extent Paragraph 75 contains any allegations against the Defendant they are denied.

**F.     Defendant' Deceptive Used Car Sales Practices**

76.     Defendants arranged financing for consumers' purchase of motor vehicles through third-party financing entities.  Each financing entity provides Defendants with a specific "buy rate," a risk-based finance charge that reflects the interest rate at which the entity will finance a retail installment contract from the dealer.  Defendants typically obtain and complete consumer applications for credit, obtain consumer credit reports, and verify income to make an initial determination whether a financing applicant will meet the financing entity's underwriting guidelines.  Defendants then submit applications to the financing entity on behalf of consumers.

**ANSWER:**  Defendant admits only that McGrath City assisted its customers to obtain financing and to the extent Paragraph 76 contains any factual allegations against the Defendant they are denied.

77.     Defendants maintain an unwritten policy and practice by which they permit sales personnel, at their discretion, to increase the cost of the transaction for consumers. Defendants act on this policy by, among other things, adding a finance charge, or "markup," to the buy rate, and adding charges for items consumers do not want or are not required.

**ANSWER:**  To the extent Paragraph 77 contains any allegations against the Defendant they are denied.

78.     Unlike the buy rate, the markup is not based on the underwriting risk or credit characteristics of the consumer submitting the application. Defendant communicate to consumers only the final total contract rate, which equals the buy rate plus the markup.

**ANSWER:**  To the extent Paragraph 78 contains any allegations against the Defendant they are

denied.

79.     The financing entity compensated Defendants from the increased interest revenue derived from the markup. Defendants' discretionary policy allows sales personnel to arrange consumers' financing with entities that permit higher markups than other entities.

**ANSWER:**  To the extent Paragraph 79 contains any allegations against the Defendant they are

denied.

80.     For example, a particular finance manager would routinely include unauthorized add-on items in retail installment contracts by lowering the APR and either keeping the consumer's payment the same, or sometimes even lowering the payment and extending the length of the loan without explanation to the consumer.

**ANSWER:**  To the extent Paragraph 80 contains any allegations against the Defendant they are

denied.

81.     The finance manager in question has an unusually close relationship with a particular credit union that allows him to regularly manipulate deals.  His relationship with the credit union was so strong that, for the right total amount financed, he could often get the credit union to extend loan rates that were reserved for consumers with A+ credit to consumers with poor credit.  These unusual finance rates were reserved for consumers that were unlikely to object to add-ons to secure the loan, significantly increasing the purchase price of the vehicle over time.

**ANSWER:**  To the extent Paragraph 81 contains any allegations against the Defendant they are

denied.

82.     Adding unwanted or unneeded charges increases the total amount the consumer pays in a cash transaction and the total amount a consumer finances in credit transactions.

**ANSWER:**  To the extent Paragraph 82 contains any allegations against the Defendant they are

denied.

83.     The fees are also based on predatory and discriminatory lending practices.  Defendant have charged, on average, Black borrowers more for markups and add-ons than similarly situated White consumers. Likewise, MCH attempts to charge female consumers more than male consumers.

**ANSWER:**  To the extent Paragraph 83 contains any allegations against the Defendant they are

denied.

84.     When consumers do discover add-on charges, MCH falsely tells the consumer that it is unable to remove add-on fees.  In certain situations, if the customer objects and is Caucasian, MCH will make concessions on the add-on fees.  However, MCH is far less willing to make concessions for non-Caucasian and/or female consumers.

**ANSWER:**  To the extent Paragraph 84 contains any allegations against the Defendant they are denied

85.     Upon information and belief, these disparities in charges are statistically significant and cannot be explained by factors related to underwriting risk or credit characteristics of the applicants.

**ANSWER:**  To the extent Paragraph 85 contains any allegations against the Defendant they are denied.

## G.      Defendant' Unlawful Advertising Practices

86.     MCH, in the course of its trade or commerce, sends e-mail advertisements to numerous Illinois residents in the greater Chicago-land area such as the advertisement included below:



**ANSWER:**  Defendant admits only that McGrath City advertised in the course of its business operations and denies any further allegations contained in Paragraph 86.

87.     Curtis, as General Manager of MCH, reviewed and approved the advertisements.

**ANSWER:**  To the extent Paragraph 87 contains any factual allegations against the Defendant they are denied.

88.     The Illinois Consumer Fraud Act, Section 2 (j) (1) prohibits dealers from using coupons in connection with the retail sale of motor vehicles.

**ANSWER:**  To the extent Paragraph 88 contains any factual allegations against the Defendant they are denied.

89.     Section 2J.1 of the Consumer Fraud Act states that "no coupon shall be offered in connection with any retail sale of a motor vehicle." 815 ILCS 505/2J.1.

**ANSWER:** To the extent Paragraph 89 contains any factual allegations against the Defendant they are denied.

90.     The e-mail offer, by including a voucher to print and present to the dealership in order to obtain a $0 down payment, operates as a coupon in connection with the retail sale of a vehicle.

**ANSWER:** To the extent Paragraph 90 contains any factual allegations against the Defendant they are denied.

91.     The e-mail offer further fails to clearly and conspicuously disclosing the required credit sales advertising disclosures anywhere on the mailer.

**ANSWER:** To the extent Paragraph 91 contains any factual allegations against the Defendant they are denied.

92.     Section 475.610 of the Illinois Motor Vehicle Advertising Regulations prohibits dealers from advertising "closed-end credit" terms in an advertisement, offer of sale, or sale of any motor vehicle if the advertisement contains a "triggering term" such as the amount of down payment.  14 Ill. Adm. Code 475.610.

**ANSWER:** To the extent Paragraph 92 contains any factual allegations against the Defendant they are denied.

93.     In the event the dealer uses a "triggering term," it must clearly and conspicuously disclose a) the amount or percentage of any down payment, terms of repayment, and "annual percentage rate" using that term spelled out in full or the abbreviation "APR", b) the contractual amount owing at the conclusion of a pre-determined schedule of installment payments, in close proximity to and, where applicable, in the same decibel tone as, the "triggering term" when a dealer advertises the availability of balloon-note financing and c) a manufacturer's or manufacturer captive finance company's tiered financing offer.  14 Ill. Adm. Code 475.610.

**ANSWER:** To the extent Paragraph 93 contains any factual allegations against the Defendant they are denied.

94.     Thus, by stating "$0 Down" in the e-mail offer, Defendant were required to make certain disclosures, which they did not.

**ANSWER:** To the extent Paragraph 94 contains any factual allegations against the Defendant they are denied.

95.     The advertisement's reference to the down payment amount is also a "triggering term" under the TILA, but the advertisement does not disclose the terms of repayment or an annual percentage rate ("APR"), as required by the TILA when a triggering term is used. 15 U.S.C. § 1664.

**ANSWER:** To the extent Paragraph 95 contains any factual allegations against the Defendant they are denied.

**H.     Ethos Is Plaintiff's Joint Employer and Engages in Unethical and Illegal Conduct**

96.     Defendant Ethos describes itself as an entity that "partners with retail automotive dealers to promote an ethical, customer-focused approach to the sale, financing and servicing of automobiles. We drive profits and customer retention by helping the dealership create a world-class ownership experience."

**ANSWER:** Defendant lacks knowledge sufficient to form a belief as to the truth of the allegations contained in Paragraph 96 and therefore, can neither admit nor deny the allegations.

97.     Ethos spends the majority of its time as a business supporting automobile dealerships.

**ANSWER:** Defendant lacks knowledge sufficient to form a belief as to the truth of the allegations contained in Paragraph 97 and therefore, can neither admit nor deny the allegations.

98.     Ethos provides automotive dealerships vehicle service contracts, credit insurance assistance, lease wear and tear, and maintenance services.

**ANSWER:** Defendant lacks knowledge sufficient to form a belief as to the truth of the allegations contained in Paragraph 98 and therefore, can neither admit nor deny the allegations.

99.     Ethos states on its website that dealerships rely on Ethos for human resources, consumer protections and safety compliance.

**ANSWER:** Defendant lacks knowledge sufficient to form a belief as to the truth of the allegations contained in Paragraph 99 and therefore, can neither admit nor deny the allegations.

100.     Ethos states that it works with dealerships to identify compliance vulnerabilities that pose a business risk and crafts innovative solutions that help protect the business and its employees.

**ANSWER:** Defendant lacks knowledge sufficient to form a belief as to the truth of the allegations contained in Paragraph 100 and therefore, can neither admit nor deny the allegations.

101.     Ethos' "team of experts serve to supplement our client dealership's staff . . . without adding to their employee overhead."

**ANSWER:** Defendant lacks knowledge sufficient to form a belief as to the truth of the allegations contained in Paragraph 101 and therefore, can neither admit nor deny the allegations.

102.     In some instances, the relationship between Ethos and a particular automobile dealership is extremely close.  That is the case with Ethos and MCH.

**ANSWER:**  Defendant lacks knowledge sufficient to form a belief as to the truth of the allegations contained in Paragraph 102 and therefore, can neither admit nor deny the allegations.

103.     At all times material to this lawsuit, Ethos worked with MCH on the sale, financing, and servicing of automobiles.

**ANSWER:**  To the extent Paragraph 103 contains any allegations against the Defendant they are denied.

104.     Indeed, most of the add-on products that MCH offers and sells to customers are ETHOS-based products, including but not limited to:

    a.    Vehicle Service Contracts/Extended Warranty - 90% Ethos /10% Hyundai
    b.    Maintenance Add-ons - 90% Ethos / 10% Hyundai
    c.    Tire/Wheel/Road Hazard Add-ons - 100% Ethos
    d.    Gap Insurance - 100% Ethos
    e.    Paintless Ding Repair - 100% Ethos
    f.    Key Replacement - 100% Ethos
    g.    Ceramic Coating - 100% Ethos
    h.    Windshield Protection - 100% Ethos
    i.    Lease Wear & Tear - 100% Ethos
    j.    Pegasus Pay/Bi-Weekly Payment Set-Up - 100% Ethos

**ANSWER:**  To the extent Paragraph 104 contains any allegations against the Defendant they are denied.

105.     With so much invested in MCH, it should come as no surprise that Ethos inserted itself into MCH's management of and employment decisions pertaining to the dealership's employees, including Plaintiff.

**ANSWER:**  To the extent Paragraph 105 contains any allegations against the Defendant they are denied.

106.     Ethos' designated executive assigned to MCH is Austin Shane.

**ANSWER:**  Defendant lacks knowledge sufficient to form a belief as to the truth of the allegations contained in Paragraph 106 and therefore, can neither admit nor deny the allegations.

107.     Mr. Shane made MCH's employment decisions in conjunction with MCH's General Manager, Kevin Curtis.

**ANSWER:**  Defendant denies the allegations contained in Paragraph 107.

108.    These employment decisions included:

    a.    The hiring of McGrath employees – and especially those in sales and finance positions;

    b.    Determining the compensation plan of employees in sales and finance positions;

    c.    The discipline of employees – especially as it relates to issues with Ethos products; and

    d.    Managing day-to-day issues relating to customers and employees.

**ANSWER:**  Defendant denies the allegations contained in Paragraph 108.

109.    As it specifically relates to Plaintiff, Mr. Shane was involved with myriad employment issues.

**ANSWER:**  Defendant denies the allegations contained in Paragraph 109.

110.    For example, in response to compliance concerns at MCH, Mr. Shane directed Plaintiff to "just do the job" and if there was blowback, that he would not be liable, and that Kevin Curtis and his team would be held responsible for any illegal activities.

**ANSWER:**  To the extent Paragraph 110 contains any factual allegations against the Defendant they are denied.

111.    In another example, in response to a payroll issue with one of Plaintiff's finance team members regarding a deduction to a paycheck, Shane informed him that MCH, Ethos and Kevin Curtis do not believe in making exceptions no matter what the circumstances are.

**ANSWER:**  To the extent Paragraph 111 contains any factual allegations against the Defendant they are denied.

112.    In response, Plaintiff asked why another finance manager, who is male, received an exception and avoided the deductions that were taken out of the female finance manager's wages.  Shane responded, "I don't know but I would stop asking about it."

**ANSWER:**  To the extent Paragraph 112 contains any factual allegations against the Defendant they are denied.

113.    In another example, Shane was asked about issues related to the Customer Satisfaction Index (CSI) that partially determined employees' pay and set the targets for same.  Believing that he had already explained the issue well enough, Shane stated "[t]hat is exactly how it was explained and we went over this pay plan multiple times.  Over and over again."

**ANSWER:** To the extent Paragraph 113 contains any allegations against the Defendant they are denied.

114. Shane was also involved in responding to concerns regarding drug use at the dealership.

**ANSWER:** To the extent Paragraph 114 contains any allegations against the Defendant they are denied.

115. In another example, Shane coordinated performance feedback and employee investigations directly with Kevin Curtis and separately met with Curtis and employees for hours at a time regarding employee concerns.

**ANSWER:** To the extent Paragraph 115 contains any factual allegations against the Defendant they are denied.

116. Shane also attended MCH events (in this case a dinner at Rose Bud) where he spoke about everything from the manipulation of sales logs to changing days off.

**ANSWER:** Defendant denies the allegations contained in Paragraph 116.

117. Shane also directed employees to reach out to him if issues with Kevin Curtis did not improve and explicitly directed the employee to "put up some money" that day and that they could meet thereafter.



**ANSWER:** To the extent Paragraph 117 contains any factual allegations against the Defendant they are denied.

118.    As stated directly by Kevin Curtis, Shane was working with Curtis to put employees "in their place."

**ANSWER:** To the extent Paragraph 118 contains any factual allegations against the Defendant they are denied.

119.    Shane also required employees to "answer" for add-on products sold to customers that were not "Ethos" products.

**ANSWER:** To the extent Paragraph 119 contains any factual allegations against the Defendant they are denied.

120.    Shane also reviewed sales records and deal files related to add-on products and then directly followed-up with employees.

**ANSWER:** To the extent Paragraph 120 contains any factual allegations against the Defendant they are denied.

121.    During these follow-up conversations, Shane would provide employee-specific instructions on what Ethos products to sell and how to sell them.

**ANSWER:** To the extent Paragraph 121 contains any factual allegations against the Defendant they are denied.

122.    Shane routinely told employees that if they did not comply with his instructions, they would not likely remain at MCH.

**ANSWER:** Defendant lacks knowledge sufficient to form a belief as to the truth of the allegations contained in Paragraph 122 and therefore, can neither admit nor deny the allegations.

123.    Shane worked directly with employee concerns regarding the way Curtis ran the dealership.

**ANSWER:** To the extent Paragraph 123 contains any factual allegations against the Defendant they are denied.

124.    In one case, in response to an employee not wanting to work with Curtis, Shane directed the employee to remain at MCH from January 9, 2022, to January 14, 2022 (while Curtis was out of town).

**ANSWER:** To the extent Paragraph 124 contains any factual allegations against the Defendant they are denied.

125.    He then promised the employee that he would figure out where to relocate the employee due to the allegations of a "toxic" culture.

**ANSWER:** To the extent Paragraph 125 contains any factual allegations against the Defendant they are denied.

126.    In fact, Curtis acknowledged this while he was out of town in a text message, firing the employee and directing her to again reach out to Shane about her "future" with the McGrath group:



**ANSWER:** To the extent Paragraph 126 contains any allegations against the Defendant they are denied.

**I.    Plaintiff's Significant Expertise in MCH"s Ethical and Legal Financing Obligations to Customers and Lenders**

127.    In October of 2021, Plaintiff became AFIP (Association of Finance & Insurance Professionals) certified.

**ANSWER:** Defendant lacks knowledge sufficient to form a belief as to the truth of the allegations contained in Paragraph 127 and therefore, can neither admit nor deny the allegations.

128.    AFIP certification is the most well-known level of compliance training that an individual can receive in the automotive industry.

**ANSWER:** To the extent Paragraph 128 contains any allegations against the Defendant they are denied.

129.    Every AFIP certified member abides by AFIP's Code of Ethics which states:

a.      In fulfilling the duties of the profession, F&I personnel serve two masters: the dealership and the customer.  The ethical F&I professional attempts to serve the customer's best interests while contributing to dealership profitability.  These directives are congruous – a scrupulous, responsive F&I manager enhances customer perception of the dealership.

b.      The F&I professional brings two parties together in a legal contract, a weighty responsibility that makes integrity of purpose and the conscientious execution of duties essential.  By adhering to the canons below, the F&I professional will command the trust of the consumer and the respect of colleagues, advancing the finance and insurance profession.

c.      The F&I professional obeys the law personally and professionally.

d.      The F&I professional holds in confidence customer information, except to disclose any data to the dealership or potential assignee of a finance contract or lease that could materially affect the viability of the transaction.

e.      The F&I professional does not make false statements or fail to disclose a material fact while performing the responsibility of the office.

f.      The F&I professional exhibits diligence of effort, striving to achieve a mastery of skills and thorough knowledge of guidelines, and performs only those tasks within his or her realm of competence.

g.      The F&I professional exemplifies ideals of good conduct, acting with integrity and maintaining a professional demeanor in the workplace and in the community.

h.      The F&I professional understands that a dealer principal is free to establish philosophies and policies governing how business is to be conducted.  Regardless of the official dealership policy or the practices condoned by management, it is incumbent upon the F&I professional to act ethically in his or her dealings with customers, even if it requires finding employment at another dealership.

i.      The F&I professional must not violate the Code of Ethics, knowingly assist or induce another to do so, or do so through the acts of another.

j.      The F&I professional understands that, as the sanctioning body for the F&I profession, AFIP actively monitors the business practices of its members and will take action if the AFIP Code of Ethics is violated, including revocation of membership or certification status.  The F&I professional also understands that any cause for action will prompt a formal review process in which the F&I professional will have the opportunity to present an assessment of the situation, with a final opinion rendered by a panel of his or her peers.

k.      The F&I professional understands his or her duties regarding the use of the Consumer Advocate Notice.  If the system is employed, every retail transaction will require both the F&I practitioner and the customer to sign the form with one copy given to the customer and one copy placed in the deal jacket.  It is understood that failure to abide by this requisite is in violation of dealer policy and AFIP's Code of Ethics. As such, a breach of this covenant is subject to action by AFIP.

l.      The F&I professional brings two parties together in a legal contract, a weighty responsibility that makes integrity of purpose and the conscientious execution of duties essential.  By adhering to this Code of Ethics the F&I professional will command the trust of the consumer and the respect of colleagues, advancing the finance and insurance profession.

**ANSWER:** To the extent Paragraph 129 contains any allegations against the Defendant they are denied.

130. In describing the benefits AFIP certified professionals bring to automotive dealerships, AFIP states:

a. For dealerships and owners, AFIP Certification gives your employees the tools necessary to operate comfortably within the law and to meet higher performance thresholds. As productive members of your team, they are less inclined to change jobs. AFIP Certification can also be used as proof of knowledge of F&I law and ethics to help settle employee disputes.

b. Certification Increases F&I Income and Reduces Losses.

c. AFIP Certified professionals answer customer questions confidently and accurately.

d. AFIP Certified professionals can meet the needs of a wide range of buyers without crossing any legal or ethical lines.

e. AFIP Certified professionals are trusted by funding sources and customers alike.

f. AFIP Certified professionals increase CSI – based on industry member feedback.

g. AFIP Certified professionals reduce the number and dollar amount of chargebacks and customer complaints.

h. AFIP Certified professionals reduce the likelihood of agency fines and legal settlements.

i. AFIP Certified professionals have a working knowledge of federal and state laws.

j. AFIP Certified professionals hold your F&I staff accountable to the AFIP Code of Ethics.

k. AFIP Certified professionals are less likely to violate a law, but if he or she does there may be a defense available to the dealership.

l. AFIP's Code of Ethics is a mandatory part of the certification process. When employees are certified, a dealership can be sure they are aware of the ethical considerations of their position.

m. AFIP Certified professionals limit dealership liability. A dealership can use the employee's AFIP Certification to produce proof that the employee was aware of the law and agreed in writing to act ethically. This shows that the dealership took action to prevent such an occurrence and that the worker's actions are not representative of the way the dealership does business.

n. The awards and professional designations that come with AFIP certification ensure that everyone who walks in your dealership will see that knowledgeable financial services professionals are on hand to help them with their vehicle purchase.

**ANSWER:** To the extent Paragraph 130 contains any allegations against the Defendant they are denied.

**J.    Plaintiff Reports to Defendants that Curtis and Shane Encouraged and Directed Employees to Engage in Fraudulent Practices**

131.    Almost immediately after joining MCH, and as described above, Plaintiff encountered illegal, fraudulent, and deceptive practices against consumers and lending institutions.

**ANSWER:** Defendant denies the allegations contained in Paragraph 131.

132.    These illegal, fraudulent, and deceptive practices were part of an on-going conspiracy to defraud customers and lending institutions.    Curtis was the lead in this conspiracy with Joe Curti, Jon Chung, Matt Montanez, and others participating.

**ANSWER:** Defendant denies the allegations contained in Paragraph 132.

133.    In furtherance of these deceptive practices, MCH would manipulate deal worksheets.

**ANSWER:** Defendant denies the allegations contained in Paragraph 133.

134.    MCH itemizes all add-on fees on a deal worksheet that is signed by the consumer and the manager that worked on the deal.

**ANSWER:** Defendant admits only that McGrath City prepared proper paperwork for sales in the dealership and denies any further allegations against the Defendant contained in Paragraph 134.

135.    Deal worksheets are actual physical documents that the customer signs when initially agreeing to purchase the vehicle.

**ANSWER:** To the extent Paragraph 135 contains any allegations against the Defendant they are denied.

136.    The deal worksheet also shows the breakdown of all add-ons and fees that the customer would have agreed to prior to going into the business office.

**ANSWER:** Defendant admits only that McGrath City prepared proper paperwork for sales in the dealership and denies any further allegations against the Defendant contained in Paragraph 136.

137.    Curtis instructed all Finance Managers to add the "junk fees" to the sales price so the fees would be hidden and not itemized.

**ANSWER:** Defendant denies the allegations contained in Paragraph 137.

138.    To that end, Curtis would instruct its finance managers to throw the deal worksheets in the garbage so that there is no evidence of charging the consumer any "junk fees."

**ANSWER:** Defendant denies the allegations contained in Paragraph 138.

139. Curtis' reasoning for the obfuscation was that MCH would not be liable for misrepresentation or fraud if the deal worksheet was not in the "deal bag." The "deal bag" is a collection of all the documents relevant and required to complete the sale.

**ANSWER:** Defendant denies the allegations contained in Paragraph 139.

140. Because there would be no paper trail to contradict the junk fees, MCH was able to simply add them to the sale price of the vehicle in MCH's computer systems and summarily reflect the artificially increased sales price on the documents provided to the consumer.

**ANSWER:** To the extent Paragraph 140 contains any allegations against the Defendant they are denied.

141. However, these worksheets are saved in the CRM tool "VinSolutions" and are also date and time stamped in a manner that correlates with when the consumer purchased the vehicle.

**ANSWER:** Defendant admits only that McGrath City prepared proper paperwork for sales in the dealership and denies any further allegations against the Defendant contained in Paragraph 141.

142. Upon information and belief, MCH can retrieve these electronic records and compare them to the documents in the deal bag.

**ANSWER:** To the extent Paragraph 142 contains any allegations against the Defendant they are denied.

143. In one instance, when a finance manager did not feel comfortable throwing out or shredding these deal worksheets, she left them in the deal bags to be scanned properly into the system.

**ANSWER:** To the extent Paragraph 143 contains any factual allegations against the Defendant they are denied.

144. Curtis noticed that the worksheets were being left in the deals bags and proceeded to yell at the finance manager for leaving them in there.

**ANSWER:** To the extent Paragraph 144 contains any factual allegations against the Defendant they are denied.

145. Over the finance manager's objections, Curtis again instructed her to remove the worksheet and throw it in the shred bin or into the garbage can.

**ANSWER:** To the extent Paragraph 145 contains any factual allegations against the Defendant they are denied.

146.     The finance manager in question did remove the worksheets; however, she did not throw them in the garbage.

**ANSWER:**  To the extent Paragraph 146 contains any factual allegations against the Defendant

they are denied.

147.     Instead, the finance manager in question kept the worksheets in a folder in her desk.

**ANSWER:**  To the extent Paragraph 147 contains any factual allegations against the Defendant

they are denied.

148.     The finance manager in question brought these concerns to Plaintiff, who had already objected and addressed these serious and unethical practices with Curtis. He again brought these concerns to Curtis who told him to "quit with the complaints."

**ANSWER:**  To the extent Paragraph 148 contains any factual allegations against the Defendant

they are denied.

149.     In September 2023, shortly after Plaintiff began working for Defendant, Plaintiff was approached by a salesperson to sign off on a sale that included a separate finance contract.  The separate finance contract included undisclosed and unreasonable aftermarket accessories and charges.

**ANSWER:**  To the extent Paragraph 149 contains any factual allegations against the Defendant

they are denied.

150.     These undisclosed and unreasonable aftermarket accessories and charges to the finance contract contradicted the sales contract and were purposefully concealed, constituting unfair and/or deceptive acts with the intent that the consumer rely on the conduct of commerce and therefore violated the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 et seq. and 720 ILCS 295/1A.

**ANSWER:**  To the extent Paragraph 150 contains any allegations against the Defendant they are

denied.

151.     Plaintiff refused to sign off and refused to engage in these fraudulent practices.

**ANSWER:**  To the extent Paragraph 151 contains any factual allegations against the Defendant

they are denied.

152.     Plaintiff was then approached by a male Finance Manager who told him that if Plaintiff did not participate, then nobody at MCH would want to work with him and that he would not last long there. Plaintiff again refused to engage in these fraudulent practices.

**ANSWER:** To the extent Paragraph 152 contains any factual allegations against the Defendant they are denied.

153.    Plaintiff was approached to sign off on similar instances where the finance contract would include concealed and/or undisclosed unreasonable aftermarket accessories and/or unreasonable charges during this time, and each time, refused to participate.

**ANSWER:** To the extent Paragraph 153 contains any factual allegations against the Defendant they are denied.

154.    These types of fraudulent activities happened daily at MCH.

**ANSWER:** Defendant denies the allegations contained in Paragraph 154.

155.    For example, in one instance, Plaintiff received a phone call from a female Finance Manager, Jorgina Beto, seeking advice regarding income/credit application fraud.

**ANSWER:** To the extent Paragraph 155 contains any factual allegations against the Defendant they are denied.

156.    Plaintiff was Beto's supervisor.

**ANSWER:** Defendant admits only that Plaintiff was in a managerial role with McGrath City and denies any further allegations contained in Paragraph 156.

157.    In this deal, Defendant Curtis submitted the finance application to the lender, but he altered the consumer's place of employment and his position to match what was previously reported on his credit bureau report – even though the consumer no longer worked at that employer and did not make the same income. Despite this, Curtis also increased the consumer's income by almost three times what he normally made.

**ANSWER:** Defendant denies the allegations contained in Paragraph 157.

158.    Because Beto was the one that signed the bank contracts, Plaintiff advised her to not do the deal and to send it back to the sales desk.

**ANSWER:** To the extent Paragraph 158 contains any factual allegations against the Defendant they are denied.

159.    Beto then informed Plaintiff that she had a meeting with Austin Shane and that he instructed her "to just do her job" and that if anything ever came out of it, that she would not be liable, and that Kevin Curtis and his team would be held responsible for any illegal activities.

**ANSWER:** To the extent Paragraph 159 contains any factual allegations against the Defendant they are denied.

160.     Plaintiff was familiar with this response as he had heard an almost identical explanation from Shane when he reported improprieties with consumer finance contracts to Shane.

**ANSWER:** To the extent Paragraph 160 contains any factual allegations against the Defendant they are denied.

161.     In another example, Plaintiff had a meeting with Defendant Curtis and Beto to discuss the concerns they had with a male Finance Manager, Matt Montanez.

**ANSWER:** To the extent Paragraph 161 contains any factual allegations against the Defendant they are denied.

162.     In that meeting, Plaintiff explained how Montanez would speak to customers and the liabilities it presented for MCH.

**ANSWER:** To the extent Paragraph 162 contains any factual allegations against the Defendant they are denied.

163.     For example, Plaintiff stated that Montanez would show up to work every day high on marijuana.

**ANSWER:** To the extent Paragraph 163 contains any factual allegations against the Defendant they are denied.

164.     Plaintiff and Beto explained that Montanez would use the drug all day long, in front of everyone, including customers.

**ANSWER:** To the extent Paragraph 164 contains any factual allegations against the Defendant they are denied.

165.     Plaintiff also stated that Montanez did not understand the legalities that came with being a Finance Manager.

**ANSWER:** To the extent Paragraph 165 contains any factual allegations against the Defendant they are denied.

166.     For example, Plaintiff explained that Montanez informed a customer that he would be filling out an 8300 form for the customer's $20,000 down payment.

**ANSWER:** To the extent Paragraph 166 contains any factual allegations against the Defendant they are denied.

167.     The customer became nervous when Montanez began talking about the 8300 form and decided that he did not want to put the cash down.

**ANSWER:** To the extent Paragraph 167 contains any factual allegations against the Defendant they are denied.

168. Montanez then told the customer that if he brought in $9,500 cash, MCH would not have to fill out the form – a manipulation of the financing process that dealerships were explicitly told not to do.

**ANSWER:** To the extent Paragraph 168 contains any factual allegations against the Defendant they are denied.

169. After a few days, the customer came to the decision not to do business with the dealership.

**ANSWER:** To the extent Paragraph 169 contains any factual allegations against the Defendant they are denied.

170. Plaintiff relayed all this information to Curtis, who laughed it off and decided not to take any action regarding these issues.

**ANSWER:** To the extent Paragraph 170 contains any factual allegations against the Defendant they are denied.

171. In another example, Beto approached Plaintiff regarding a pay issue and asked if Plaintiff would sit in the office with her while she had a conversation with Curtis about it.

**ANSWER:** To the extent Paragraph 171 contains any factual allegations against the Defendant they are denied.

172. Beto and Curtis ultimately decided to agree to disagree: Curtis decided to pay Beto what she was asking for and Beto turned around and donated the money for a salesperson spiff the next Saturday.

**ANSWER:** To the extent Paragraph 172 contains any factual allegations against the Defendant they are denied.

173. However, during that meeting, Curtis made a derogatory comment about "being done negotiating with terrorists."

**ANSWER:** Defendant denies the allegations contained in Paragraph 173.

174. Beto's family is from the Middle East.

**ANSWER:** To the extent Paragraph 174 contains any factual allegations against the Defendant they are denied.

175. Beto and Plaintiff were deeply offended by the comment.

**ANSWER:** To the extent Paragraph 175 contains any factual allegations against the Defendant they are denied.

176.    Plaintiff told Curtis that he was "inviting a discrimination lawsuit" and Curtis laughed, stating that "she [Beto] had no idea what was coming."

**ANSWER:** Defendant denies the allegations contained in Paragraph 176.

177.    In another example, Plaintiff conducted a training session with Caro, Beto, Yesenia Rosario, Michael Vaughn, Jaden Miranda, and Nick Urtis.

**ANSWER:** To the extent Paragraph 177 contains any factual allegations against the Defendant they are denied.

178.    After the training session, Plaintiff held a round table discussion to see what MCH could do better as a management team to make the culture better at the store.

**ANSWER:** To the extent Paragraph 178 contains any factual allegations against the Defendant they are denied.

179.    The attendees responded that they hated the way Curtis treated them and that they wanted Curtis to treat them fairly and with respect.

**ANSWER:** To the extent Paragraph 179 contains any factual allegations against the Defendant they are denied.

180.    The attendees also told Plaintiff that they wanted their voices heard by upper management and that they knew upper management was purposefully ignoring Curtis' conduct.

**ANSWER:** To the extent Paragraph 180 contains any factual allegations against the Defendant they are denied.

181.    Specifically, a female employee stated that Curtis treated women like second-class citizens and steals money from them.

**ANSWER:** To the extent Paragraph 181 contains any factual allegations against the Defendant they are denied.

182.    The female employee stated that if they complain about pay issues, Curtis ignores them, and then retaliates against them in various ways – from cutting hours, to changing schedules, to openly critiquing and harassing them at work in front of male coworkers.

**ANSWER:** To the extent Paragraph 182 contains any factual allegations against the Defendant they are denied.

183.     Plaintiff attempted to relay these concerns to Curtis in a calm and diplomatic manner so that the management team could learn from it and improve employee morale.

**ANSWER:**  To the extent Paragraph 183 contains any factual allegations against the Defendant they are denied.

184.     Curtis responded by yelling at Plaintiff and telling him, of all things, to stop talking with MCH employees about "work issues."

**ANSWER:**  Defendant denies the allegations contained in Paragraph 184.

185.     In another example, Montanez asked Plaintiff to look over paperwork from a deal that closed the same day.

**ANSWER:**  To the extent Paragraph 185 contains any factual allegations against the Defendant they are denied.

186.     It was clear that Montanez was uneasy about the paperwork and that he wanted Plaintiff's sign-off.

**ANSWER:**  To the extent Paragraph 186 contains any factual allegations against the Defendant they are denied.

187.     Plaintiff found missing signatures on the contract and told Montanez that the customer would have to come back and re-sign. Montanez responded, "don't worry I will handle it."

**ANSWER:**  To the extent Paragraph 187 contains any factual allegations against the Defendant they are denied.

188.     About 30 minutes later, Beto walked into Plaintiff's office, reviewed the contract, and saw that the signatures had already been affixed.

**ANSWER:**  To the extent Paragraph 188 contains any factual allegations against the Defendant they are denied.

189.     This was troubling because the customer had not returned to the dealership to sign the documents.

**ANSWER:**  To the extent Paragraph 189 contains any factual allegations against the Defendant they are denied.

190.     Shortly thereafter, Montanez proceeded to turn the deal in to Beto with the fraudulent signatures affixed.

**ANSWER:** To the extent Paragraph 190 contains any factual allegations against the Defendant they are denied.

191.    Beto removed the contract from the deals and threw it in the shredder.

**ANSWER:** To the extent Paragraph 191 contains any factual allegations against the Defendant they are denied.

192.    After talking with Plaintiff, Beto immediately began working to get a new contract signed.

**ANSWER:** To the extent Paragraph 192 contains any factual allegations against the Defendant they are denied.

193.    Plaintiff took this additional issue to Curtis who stated that Plaintiff should stop trying to "blow up" deals and that Plaintiff and Beto were unnecessarily "complicating" things.

**ANSWER:** Defendant denies the allegations contained in Paragraph 193.

194.    Curtis retaliated against Beto and Plaintiff in various ways.

**ANSWER:** Defendant denies the allegations contained in Paragraph 194.

195.    In one instance, shortly after Beto and Plaintiff voiced their concerns about improper pay practices, Curtis spoke with Plaintiff and commented that Beto was "not going to be very happy about her wash sheet for last month."

**ANSWER:** Defendant denies the allegations contained in Paragraph 195.

196.    Plaintiff asked Curtis what he meant by that.  Curtis stated with a wry smile that he was deducting pay from her earnings as a penalty for selling Hyundai warranties rather than Ethos warranties.

**ANSWER:** Defendant denies the allegations contained in Paragraph 196.

197.    Plaintiff warned Curtis that his actions would: violate various agreements with Hyundai; violate wage and hour laws; and be viewed as discriminatory retaliation.

**ANSWER:** Defendant denies the allegations contained in Paragraph 197.

198.    Curtis continued to smile and told Plaintiff he was "next."  Curtis then directed Plaintiff to review Beto's wash sheet with her.

**ANSWER:** Defendant denies the allegations contained in Paragraph 198.

199.    Reluctantly and while verbally objecting to Curtis' treatment of Beto, Plaintiff went over all the details with her regarding the sale of Hyundai warranties as opposed to warranties offered by Ethos.

**ANSWER:** To the extent Paragraph 199 contains any factual allegations against the Defendant they are denied.

200.   Plaintiff then explained to Beto that she would not receive any credit for the dozens of Hyundai warranties she had sold.

**ANSWER:** To the extent Paragraph 200 contains any factual allegations against the Defendant they are denied.

201.   Beto was very upset about what she stated were discriminatory and unfair pay practices and specifically, in this case, the improper deductions.

**ANSWER:** To the extent Paragraph 201 contains any factual allegations against the Defendant they are denied.

202.   Beto then showed Plaintiff Montanez's wash sheet, which she snapped a picture of on her phone days prior.

**ANSWER:** To the extent Paragraph 202 contains any factual allegations against the Defendant they are denied.

203.   It was clear that Curtis had reviewed Montanez's wash sheet with him and had written all over it, showing what MCH could have deducted -- but didn't.

**ANSWER:** Defendant denies the allegations contained in Paragraph 203.

204.   Plaintiff's review of the wash sheet showed that Montanez was actually overpaid in several categories and did not receive deductions in any of the categories that Beto had received deductions.

**ANSWER:** Defendant denies the allegations contained in Paragraph 204.

205.   Plaintiff then went into Curtis's office to discuss the details of the conversation with Beto.

**ANSWER:** To the extent Paragraph 205 contains any factual allegations against the Defendant they are denied.

206.   Curtis asked Plaintiff how it went, and Plaintiff responded, "terribly."

**ANSWER:** To the extent Paragraph 206 contains any factual allegations against the Defendant they are denied.

207.   Plaintiff then told Curtis that Beto and other women in the office think MCH is a "boy's club" and that the types of stunts Curtis was pulling with the wash sheets – by penalizing Beto while rewarding Montanez for the same or similar conduct -- was outright discriminatory.

**ANSWER:** To the extent Paragraph 207 contains any factual allegations against the Defendant they are denied.

208.     Plaintiff then showed Curtis the screenshot of Montanez's wash sheet.

**ANSWER:** To the extent Paragraph 208 contains any factual allegations against the Defendant they are denied.

209.     Curtis responded that he was trying to build up Montanez and allow him to realize his potential and that Beto was lucky for what she got from MCH.

**ANSWER:** To the extent Paragraph 209 contains any factual allegations against the Defendant they are denied.

210.     Then, while getting louder and louder, Curtis ultimately yelled: "fuck her if she doesn't understand that."

**ANSWER:** Defendant denies the allegations contained in Paragraph 210.

211.     Plaintiff responded by reviewing the wash sheets side by side with Curtis, clearly demonstrating that he was docking Beto for the same activity that he was rewarding Montanez for and that the difference in treatment was costing Beto more than $5,000 a month.

**ANSWER:** Defendant denies the allegations contained in Paragraph 211.

212.     In response, Curtis smirked and said, "oh I guess I did do that." Plaintiff told Curtis not to lie to him and that Curtis should pick a different battle because this is "full blown discrimination no matter how you look at it."

**ANSWER:** Defendant denies the allegations contained in Paragraph 212.

213.     Plaintiff then stated that Beto and Montanez do the same job, they are the same age, they are different genders, and Beto is a minority that Curtis called a terrorist.

**ANSWER:** To the extent Paragraph 213 contains any allegations against the Defendant they are denied.

214.     Curtis responded by saying that he was the GM and that: he can do "whatever the fuck [he] wanted"; he wasn't "changing shit"; and that he was "done negotiating terrorists."

**ANSWER:** Defendant denies the allegations contained in Paragraph 214.

215.     Curtis then told Plaintiff that Austin Shane was going to put "[Beto] in her place tomorrow."

**ANSWER:** Defendant denies the allegations contained in Paragraph 215.

216.    Shortly thereafter, Curtis informed Plaintiff that he was terminating Beto from MCH.

**ANSWER:**  Defendant denies the allegations contained in Paragraph 216.

217.    Plaintiff asked Curtis what brought this about, and Curtis told Plaintiff that Beto was "trouble" and "only temporary."

**ANSWER:**  Defendant denies the allegations contained in Paragraph 217.

**K.    Defendants Conduct A Sham Investigation**

218.    Beto filed a report and complaint with Dan Hunt regarding Curtis' treatment of her and the retaliation she suffered for speaking out about various forms of discrimination and improper, unethical finance practices.

**ANSWER:**  Defendant admits only that Beto contacted Dan Hunt after her termination with various complaints and denies any further allegations against the Defendants contained in Paragraph 218.

219.    From that moment forward, Curtis began a rampant campaign of retaliation against Plaintiff.

**ANSWER:**  Defendant denies the allegations contained in Paragraph 219.

220.    Curtis openly ignored Plaintiff in front of MCH employees and customers.

**ANSWER:**  To the extent Paragraph 220 contains any factual allegations against the Defendant they are denied.

221.    Curtis would routinely speak in a derogatory fashion about Plaintiff with employees, who then reported this to Plaintiff.

**ANSWER:**  Defendant denies the allegations contained in Paragraph 221.

222.    Other employees also observed Curtis "following [Plaintiff] around the dealership on a regular basis."

**ANSWER:**  To the extent Paragraph 222 contains any factual allegations against the Defendant they are denied.

223.    Beto's complaint triggered an investigation by Dan Hunt in early January 2023.

**ANSWER:**  Defendant admits only that Dan Hunt arranged for an investigation of the various complaints reported to him by Ms. Beto after her termination and denies any further allegations against the Defendant contained in Paragraph 223.

224. Unfortunately, despite Curtis being the subject of the investigation, Hunt brought Curtis into it, telling him that interviews would take place

**ANSWER:** To the extent Paragraph 224 contains any factual allegations against the Defendant they are denied.

225. Hunt, Shane, and Curtis were observed routinely meeting during the investigation and, occasionally, for several hours at a time.

**ANSWER:** To the extent Paragraph 225 contains any factual allegations against the Defendant they are denied.

226. While various managers came and went during the investigation interviews, Plaintiff (the Sales Manager) was excluded from all interviews.

**ANSWER:** To the extent Paragraph 226 contains any factual allegations against the Defendant they are denied.

227. On January 24, 2023, Plaintiff received an email from a customer that he had spoken with the night before.

**ANSWER:** Defendant lacks knowledge sufficient to form a belief as to the truth of the allegations contained in Paragraph 227 and therefore, can neither admit nor deny the allegations.

228. The customer informed Plaintiff that documents that Montanez gave her were fraudulent and that the signatures on the contract and the bill of sale were not hers. She then stated that she was contacting her attorney.

**ANSWER:** Defendant lacks knowledge sufficient to form a belief as to the truth of the allegations contained in Paragraph 228 and therefore, can neither admit nor deny the allegations.

229. Plaintiff let the customer know that he was out of the office that day and would investigate everything when he returned the next morning.

**ANSWER:** Defendant lacks knowledge sufficient to form a belief as to the truth of the allegations contained in Paragraph 229 and therefore, can neither admit nor deny the allegations.

230. Plaintiff then forwarded the customer's concerns to Fatten Hadded (HR) and Brian Chlada (Controller).

**ANSWER:** Defendant lacks knowledge sufficient to form a belief as to the truth of the allegations contained in Paragraph 230 and therefore, can neither admit nor deny the allegations.

231. Hadded and Chlada thanked Plaintiff for bringing the issue to their attention and that they would immediately look into it.

**ANSWER:** Defendant lacks knowledge sufficient to form a belief as to the truth of the allegations contained in Paragraph 231 and therefore, can neither admit nor deny the allegations.

232. The next day, Plaintiff turned all the documents over to Hadded and let her know that Montanez signed a new contract for the customer two days after she signed the first contract.

**ANSWER:** Defendant lacks knowledge sufficient to form a belief as to the truth of the allegations contained in Paragraph 232 and therefore, can neither admit nor deny the allegations.

233. Plaintiff also informed Hadded that Montanez increased the price on one of his warranty policies and found a lower interest rate to set off the add-ons and increase his profit.

**ANSWER:** Defendant lacks knowledge sufficient to form a belief as to the truth of the allegations contained in Paragraph 233 and therefore, can neither admit nor deny the allegations.

234. Plaintiff further explained that Montanez matched the payments so that the customer would not catch the add-ons and that he [Montanez] then fraudulently signed the new contract for the customer.

**ANSWER:** Defendant lacks knowledge sufficient to form a belief as to the truth of the allegations contained in Paragraph 234 and therefore, can neither admit nor deny the allegations.

235. Plaintiff then showed Hadded other examples of forged documents.

**ANSWER:** Defendant lacks knowledge sufficient to form a belief as to the truth of the allegations contained in Paragraph 235 and therefore, can neither admit nor deny the allegations.

236. Plaintiff was terminated days later.

**ANSWER:** Defendant admits only that Plaintiff was terminated for performance issues, including his harassment of a McGrath City employee that he supervised and denies any further allegations contained in Paragraph 236.

**L.    Defendants Failed to Pay Plaintiff in Accordance with His Compensation Plan**

237. Plaintiff was to be paid in accordance with a Compensation Plan. See Compensation Plan, attached as Exhibit A.

**ANSWER:** To the extent Paragraph 237 contains any factual allegations against the Defendant they are denied.

238.    Pursuant to the terms of this plan, Plaintiff was to receive a base salary, a monthly draw, commissions on sales, a Demo Allowance, and various other incentives.

**ANSWER:**  To the extent Paragraph 238 contains any factual allegations against the Defendant they are denied.

239.    Plaintiff was also supposed to receive Paid Time Off ("PTO") as part of his compensation structure.

**ANSWER:**  To the extent Paragraph 239 contains any factual allegations against the Defendant they are denied.

240.    Between October of 2022 and February of 2023, Defendants failed to pay Plaintiff in accordance with his compensation plan.  These failures included:

   a.   Failing to pay and/or incorrectly paying Plaintiff's Demo Allowances;
   b.   Failing to pay and/or incorrectly paying Plaintiff his base salary;
   c.   Failing to pay and/or incorrectly paying Plaintiff his commissions; and
   d.   Failing to pay and/or incorrectly paying Plaintiff's accrued but unused PTO following his termination.

**ANSWER:**  To the extent Paragraph 240 contains any factual allegations against the Defendant they are denied.

241.    Prior to Plaintiff's termination, he repeatedly complained to Defendants regarding his incorrect wage payments.

**ANSWER:**  To the extent Paragraph 241 contains any factual allegations against the Defendant they are denied.

### COUNT I
### Disparate Treatment (Retaliatory Discharge) in Violation of Title VII of the Civil Rights Act, 42 U.S.C. § 200e-3(a)
### (Against All Corporate Defendant)

242.    Plaintiff incorporates and realleges all preceding Paragraphs of this Complaint as though fully set forth herein this Paragraph of Count I of this Complaint.

**ANSWER:**  Defendant incorporates and restates his responses to paragraph 1 through 241 as if fully set forth herein.

243.    At all times material to this Complaint, Defendants employed 15 or more employees within the meaning of Title VII. 42 U.S.C. § 2000e(a).

**ANSWER:** Defendant lacks knowledge sufficient to form a belief as to the truth of the allegations contained in Paragraph 243 and therefore, can neither admit nor deny the allegations.

244.     At all times material to this Complaint, Plaintiff was an employee of Defendants within the meaning of Title VII. 42 U.S.C. § 2000e(b).

**ANSWER:** Defendant admits only that Plaintiff was employed with McGrath City and denies any further allegations contained Paragraph 244.

245.     At all times material to this Complaint, Title VII prohibited employers from retaliating against employees for engaging in the protected activity of opposing any practice unlawful under Title VII, including sexual, national origin, and racial harassment.

**ANSWER:** To the extent Paragraph 245 contains any factual allegations against the Defendant they are denied.

246.     As alleged herein this Complaint, Plaintiff repeatedly engaged in protected activities under Title VII.

**ANSWER:** Defendant denies the allegations contained in Paragraph 246.

247.     Defendants had actual and/or constructive knowledge of Plaintiff's Title VII protected activity.

**ANSWER:** Defendant denies the allegations contained in Paragraph 247.

248.     Defendants terminated Plaintiff because of his Title VII protected activity, as well as for his other protected activity as alleged in this Complaint.

**ANSWER:** Defendant denies the allegations contained in Paragraph 248.

249.     Defendants did not terminate employees similarly situated to Plaintiff who did not engage in Title VII protected activity.

**ANSWER:** To the extent Paragraph 249 contains any factual allegations against the Defendant they are denied.

250.     Defendants, by and through its agents, engaged in the aforementioned conduct, acts, and omissions when they knew or should have known that the same were in violation of Title VII and any alleged reasons to the contrary are pretextual.

**ANSWER:** Defendant denies the allegations contained in Paragraph 250.

251.     The retaliatory actions by Defendants, through their management, agents and employees, were intentional and willful, and in deliberate disregard for the laws cited herein.

**ANSWER:** Defendant denies the allegations contained in Paragraph 251.

**COUNT II**
**Disparate Treatment (Retaliatory Discharge) in Violation of the Illinois Human Rights Act,**
**775 ILCS 5/6-101(A)**
**(Against All Defendant)**

252.     Plaintiff incorporates and realleges all preceding Paragraphs of this Complaint as though fully set forth herein this Paragraph of Count II of this Complaint.

**ANSWER:**  Defendant incorporates and restates his responses to paragraph 1 through 251 as if fully set forth herein.

253.     At all times material to this Complaint, Defendants employed 1 or more employees in the State of Illinois.

**ANSWER:**  Defendant admits only that McGrath City employed more than 1 employee and denies any further allegations contained in Paragraph 253.

254.     At all times material to this Complaint, Defendants were an employer of Plaintiff within the meaning of the IHRA. 775 ILCS 5/2-101(B).

**ANSWER:**  Defendant admits only that Plaintiff was employed with McGrath City and denies any further allegations contained Paragraph 254.

255.     At all times material to this Complaint, Plaintiff was an employee of Defendants within the meaning of Title VII. 775 ILCS 5/2-101(A).

**ANSWER:**  Defendant admits only that Plaintiff was employed with McGrath City and denies any further allegations contained Paragraph 255.

256.     At all times material to this Complaint, the IHRA prohibited employers from retaliating against employees for engaging in the protected activity of opposing any practice the employee reasonably and in good faith believed to be harassment, discrimination, and retaliation.

**ANSWER:**  To the extent Paragraph 256 contains any factual allegations against the Defendant they are denied.

257.     As alleged herein this Complaint, Plaintiff repeatedly engaged in protected activities under the IHRA.

**ANSWER:**  Defendant denies the allegations contained in Paragraph 257.

258.     As alleged herein this Complaint, Defendants had actual and/or constructive knowledge of Plaintiff's IHRA protected activity.

**ANSWER:**  Defendant denies the allegations contained in Paragraph 258.

259.     Defendants terminated Plaintiff because of his IHRA protected activity, as well as for his other protected activity as alleged in this Complaint.

**ANSWER:**  Defendant denies the allegations contained in Paragraph 259.

260.     Defendants did not terminate similarly situated employees who did not engage in IHRA protected activity.

**ANSWER:**  To the extent Paragraph 260 contains any factual allegations against the Defendant

they are denied.

261.     Defendant, by and through their agents, engaged in the foregoing acts and conduct when it knew or should have known that the same were in violation of IHRA and any alleged reasons to the contrary are pretextual.

**ANSWER:**  Defendant denies the allegations contained in Paragraph 261.

<u>**COUNT III**</u>
**Retaliatory Discharge Under Illinois Common Law**
**(Against All Defendant)**

262.     Plaintiff incorporates and realleges all preceding Paragraphs of this Complaint as though fully set forth herein this Paragraph of Count III of this Complaint.

**ANSWER:**  Defendant incorporate and restate their responses to paragraph 1 through 261 as if

fully set forth herein.

263.     At all times material to this Complaint, Defendants were "employers" of Plaintiff within the meaning of Illinois common law.

**ANSWER:**  To the extent Paragraph 263 contains any factual allegations against the Defendant

they are denied.

264.     At all times material to this Complaint, Illinois common law prohibited employers from discharging employees in retaliation for reporting to the employer activity the employee believed reasonably and in good faith to be criminal and contrary to the clearly mandated public policy of Illinois.

**ANSWER:**  To the extent Paragraph 264 contains any factual allegations against the Defendant

they are denied.

265.     As alleged herein this Complaint, Plaintiff engaged in protected activity under Illinois common law when he reported the concerns outlined in the Complaint to Defendants.

**ANSWER:**  Defendant denies the allegations contained in Paragraph 265.

266.     The laws at issue here include, but are not limited to, the Illinois crime of forgery, 720 ILCS 5/17-3, the federal crimes of bank fraud 18 U.S.C. § 1344, wire fraud 18 U.S.C. § 1343, Illinois

Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 et seq., the Illinois Motor Vehicle Advertising Regulations, 14 Ill. Adm. Code 475.110 et seq., Sections 13(b) and 19 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b), 57b, the Truth in Lending Act ("TILA"), 15 U.S.C. §§ 1601-1666j, and its implementing Regulation Z, 12 C.F.R. Part 226, the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. §§ 1691-1691f, and the Illinois Wage Payment & Collection Act.

**ANSWER:** To the extent Paragraph 266 contains any factual allegations against the Defendant they are denied.

267.    In addition to the myriad discriminatory acts, Defendants' violations of the laws stated in the previous paragraph are in connection with the advertising, marketing, promotion, offering for sale, lease, and financing of vehicles as well as Illinois law guaranteeing the proper and timely payment of wages.

**ANSWER:** To the extent Paragraph 267 contains any factual allegations against the Defendant they are denied.

268.    As alleged herein this Complaint, the Plaintiff engaged in protected activity under Illinois common law when he reported to Defendants his reasonable and good-faith belief that Defendants repeatedly violated the laws referenced herein.

**ANSWER:** Defendant denies the allegations contained in Paragraph 268.

269.    Defendants' discharge of Plaintiff in retaliation for his protected activities was in violation of the clearly mandated public policy of Illinois and constituted the Illinois common law tort of retaliatory discharge.

**ANSWER:** Defendant denies the allegations contained in Paragraph 269.

270.    Defendants' conduct was willful, wanton, reckless and/or deliberate which justifies imposition of punitive damages.

**ANSWER:** Defendant denies the allegations contained in Paragraph 270.

<u>**COUNT IV**</u>
**Retaliation in Violation of the Illinois Wage Payment and Collection Act**
**(820 ILCS 115, *et. seq.*)**
**(Against All Defendant)**

271.    Plaintiff incorporates and realleges all preceding Paragraphs of this Complaint as though fully set forth herein this Paragraph of Count IV of this Complaint.

**ANSWER:** Defendant incorporates and restates his responses to paragraph 1 through 270 as if fully set forth herein.

272.    Defendants are "employers" and Plaintiff is an "employee" within the meaning of the Illinois Wage Payment and Collection Act ("IWPCA") (820 ILCS 115/2).

**ANSWER:** Defendant admits only that McGrath City employed Plaintiff and denies any further allegations contained in Paragraph 272.

273. Plaintiff complained to Defendants regarding their failure to pay him, as well as their failure to pay other employees, in accordance with the IWPCA.

**ANSWER:** Defendant denies the allegations contained in Paragraph 273.

274. Plaintiff was terminated for complaining about Defendants' failure to pay him and others in accordance with the IWPCA.

**ANSWER:** Defendant denies the allegations contained in Paragraph 274.

275. Plaintiff has suffered damages because of his termination.

**ANSWER:** Defendant denies the allegations contained in Paragraph 275.

<u>**COUNT V**</u>
**Violation of the Illinois Wage Payment and Collection Act**
**(Against All Defendant)**

276. Plaintiff incorporates and realleges all preceding Paragraphs of this Complaint as though fully set forth herein this Paragraph of Count V of this Complaint.

**ANSWER:** Defendant incorporates and restates his responses to paragraph 1 through 275 as if fully set forth herein.

277. Defendants are "employers" and Plaintiff is an "employee" within the meaning the Illinois Wage Payment and Collection Act ("IWPCA") (820 ILCS 115/2).

**ANSWER:** Defendant admits only that McGrath City employed Plaintiff and denies any further allegations contained in Paragraph 277.

278. The IWPCA requires employers to, among other things, pay commissions monthly (820 ILCS 115/3) and to pay all wages no later than 13 days after the end of the pay period in which the wages were earned.

**ANSWER:** To the extent Paragraph 278 contains any factual allegations against the Defendant they are denied.

279. Defendants agreed to pay Plaintiff pursuant to the Compensation Plan and its subsequent modifications.

**ANSWER:** To the extent Paragraph 279 contains any factual allegations against the Defendant they are denied.

280.    Defendants failed to pay Plaintiff his earned commissions, demo allowance, paid time off, and other incentives in accordance with the Illinois Wage Payment and Collection Act (820 ILCS 115/5) and Plaintiff's Compensation Plan and its subsequent modifications.

**ANSWER:**  To the extent Paragraph 280 contains any factual allegations against the Defendant they are denied.

281.    Defendants failed to pay Plaintiff his accrued but unused PTO after his termination in violation of the Illinois Wage Payment and Collection Act (820 ILCS 115/5).

**ANSWER:**  To the extent Paragraph 281 contains any factual allegations against the Defendant they are denied.

282.    As a direct result of Defendants violations of the IWPCA, Plaintiff suffered a loss of compensation in an amount in excess of $10,000.

**ANSWER:**  To the extent Paragraph 282 contains any factual allegations against the Defendant they are denied.

<u>COUNT VI</u>
**Negligent Hiring and Retention**
**(Against All Corporate Defendant)**

283.    Plaintiff incorporates and realleges all preceding Paragraphs of this Complaint as though fully set forth herein this Paragraph of Count VI of this Complaint.

**ANSWER:**  Defendant incorporates and restates his responses to paragraph 1 through 282 as if fully set forth herein.

284.    At all relevant times, Defendants had a duty to act reasonably in hiring and retaining its employees, including Defendant Curtis.

**ANSWER:**  To the extent Paragraph 284 contains any factual allegations against the Defendant they are denied.

285.    Defendants terminated Curtis after they terminated Plaintiff.

**ANSWER:**  Defendant admits only that he was terminated and denies any further allegations contained in Paragraph 285.

286.    Prior to his employment with MCH, Curtis was fired from another dealership because of misconduct.

**ANSWER:** To the extent Paragraph 286 contains any factual allegations against the Defendant they are denied.

287. Defendants knew or should have known of Curtis' rampant on-premises drug use.

**ANSWER:** To the extent Paragraph 287 contains any factual allegations against the Defendant they are denied.

288. Defendants knew or should have known that Curtis was charged with criminal sexual assault for a victim between the age of 13 and 17 (position of trust) and confined to jail.

**ANSWER:** To the extent Paragraph 288 contains any factual allegations against the Defendant they are denied.

289. In addition to the allegations above, Curtis openly discussed taking drugs at the dealership, hosting his "girlfriend" at the office, and "targeting" employees he did not like.

**ANSWER:** To the extent Paragraph 289 contains any factual allegations against the Defendant they are denied.

290. Curtis openly and notoriously engaged in illegal and inappropriate conduct that a reasonable employer should have known about or would otherwise have discovered.

**ANSWER:** To the extent Paragraph 290 contains any factual allegations against the Defendant they are denied.

291. Such due diligence is especially important when employees like Curtis were hired to manage people, work with customers, and oversee significant financial transactions.

**ANSWER:** To the extent Paragraph 291 contains any factual allegations against the Defendant they are denied.

292. Defendants did not exercise reasonable care in hiring and retaining Curtis.

**ANSWER:** To the extent Paragraph 292 contains any factual allegations against the Defendant they are denied.

293. Defendants knew or should have known of Curtis' improper and illegal activities.

**ANSWER:** To the extent Paragraph 293 contains any factual allegations against the Defendant they are denied.

294. Defendants failed to investigate employee complaints regarding Curtis.

**ANSWER:** To the extent Paragraph 294 contains any factual allegations against the Defendant they are denied.

295.     Defendants failed to investigate Curtis' illegal and improper conduct despite the details of some of that conduct being publicly available.

**ANSWER:** To the extent Paragraph 295 contains any factual allegations against the Defendant they are denied.

296.     Defendant failed to investigate reports of Curtis' misconduct after he was employed and failed to act on reports of illegal conduct.

**ANSWER:** To the extent Paragraph 296 contains any factual allegations against the Defendant they are denied.

297.     Defendants knew or should have known that Curtis demonstrated a particular unfitness for the position of General Manager, and that this likely would result in malfeasance and improper employee, customer, and finance practices.

**ANSWER:** To the extent Paragraph 297 contains any factual allegations against the Defendant they are denied.

298.     As a direct and proximate cause of Defendants' negligent acts and omissions, Plaintiff suffered injuries, including but not limited to, violations of the IWPCA, retaliation, discrimination, emotional distress, and termination.

**ANSWER:** Defendant denies the allegations contained in Paragraph 298.

<u>**COUNT VII**</u>
**Negligent Supervision**
**(Against All Corporate Defendant)**

299.     Plaintiff incorporates and realleges all preceding Paragraphs of this Complaint as though fully set forth herein this Paragraph of Count VII of this Complaint.

**ANSWER:** Defendant incorporates and restates his responses to paragraph 1 through 298 as if fully set forth herein.

300.     At all relevant times, Defendants, as Plaintiff's employers, had a duty to supervise their employees, including Defendant Curtis and to make sure its employees engage in appropriate behavior.

**ANSWER:** To the extent Paragraph 300 contains any factual allegations against the Defendant they are denied.

301.     Defendants breached their duty to supervise Defendant Curtis by failing to monitor his conduct or the fraudulent practices at MCH.

**ANSWER:**  To the extent Paragraph 301 contains any factual allegations against the Defendant they are denied.

302.     Plaintiff suffered injuries, including but not limited to, violations of the IWPCA, retaliation, discrimination, emotional distress, and unlawful termination.

**ANSWER:**  Defendant denies the allegations contained in Paragraph 302.

**COUNT VIII**
**Willful and Wanton Hiring and Retention**
**(Against All Corporate Defendant)**

303.     Plaintiff incorporates and realleges all preceding Paragraphs of this Complaint as though fully set forth herein this Paragraph of Count VIII of this Complaint.

**ANSWER:**  Defendant incorporates and restates his responses to paragraph 1 through 302 as if fully set forth herein.

304.     At all relevant times, Defendants, as Plaintiff's employers, had a duty to act reasonably in hiring and retaining its employees, including the Defendant Curtis.

**ANSWER:**  To the extent Paragraph 304 contains any factual allegations against the Defendant they are denied.

305.     Defendants knew or should have known that Defendant Curtis demonstrated a particular unfitness for the position of General Manager, and that this likely would result in malfeasance and improper employee, finance, and customer practices.

**ANSWER:**  To the extent Paragraph 305 contains any factual allegations against the Defendant they are denied.

306.     As a direct and proximate cause of Defendants' negligent acts and omissions, Plaintiff suffered injuries, including but not limited to, violations of the IWPCA, retaliation, discrimination, emotional distress, and unlawful termination.

**ANSWER:**  Defendant denies the allegations contained in Paragraph 306.

**COUNT IX**
**Willful and Wanton Failure to Supervise**
**(Against All Corporate Defendant)**

307.     Plaintiff incorporates and realleges all preceding Paragraphs of this Complaint as though fully set forth herein this Paragraph of Count IX of this Complaint.

**ANSWER:** Defendant incorporates and restates his responses to paragraph 1 through 306 as if fully set forth herein.

308.    At all relevant times, Defendants, as Plaintiff's employers, had a duty to supervise their employees, including Defendant Curtis and to make sure its employees engage in appropriate behavior.

**ANSWER:** To the extent Paragraph 308 contains any factual allegations against the Defendant they are denied.

309.    Defendants breached their duty to supervise Defendant Curtis by failing to monitor his conduct, and specifically, his conduct as it relates to Plaintiff.

**ANSWER:** To the extent Paragraph 309 contains any factual allegations against the Defendant they are denied.

310.    As a direct and proximate cause of Defendants' willful and wanton conduct in hiring and retaining Defendant Curtis, Plaintiff suffered injuries, including but not limited to, violations of the IWPCA, retaliation, discrimination, emotional distress, and unlawful termination.

**ANSWER:** Defendant denies the allegations contained in Paragraph 310.

### COUNT X
**Intentional Inflection of Emotional Distress**
**(Against All Defendant)**

311.    Plaintiff incorporates and realleges all preceding Paragraphs of this Complaint as though fully set forth herein this Paragraph of Count X of this Complaint.

**ANSWER:** Defendant incorporates and restates his responses to paragraph 1 through 310 as if fully set forth herein.

312.    During the period that Plaintiff was complaining about various illegal practices relating to employees, customers, and financial practices, Defendants MCH, ETHOS, MAI, and Curtis were plotting behind his back to disparage, retaliate, and terminate Plaintiff.

**ANSWER:** Defendant denies the allegations contained in Paragraph 312.

313.    Defendants were in a position of power of Plaintiff.

**ANSWER:** Defendant denies the allegations contained in Paragraph 313.

314.    Defendants knew of Plaintiff's bona fide and legitimate concerns.

**ANSWER:** Defendant denies the allegations contained in Paragraph 314.

315.     Defendants' conduct, in leading Plaintiff to believe he would be paid correctly and managed in a manner consistent with standard employment practices, while simultaneously plotting and intending to fire him was extreme and outrageous, from the perspective of a reasonable person.

**ANSWER:**  Defendant denies the allegations contained in Paragraph 315.

316.     Upon hearing the facts of this case, as alleged herein, shown by discovery, and to be proved at trial would cause a reasonable person to exclaim outrageous.

**ANSWER:**  Defendant denies the allegations contained in Paragraph 316.

317.     Defendants conduct caused Plaintiff to suffer severe emotional distress.

**ANSWER:**  Defendant denies the allegations contained in Paragraph 317.

## AFFIRMATIVE DEFENSES

In further answering Plaintiff's Complaint, and by way of affirmative defenses, Defendant alleges as follows:

## FIRST AFFIRMATIVE DEFENSE

Plaintiff has failed to state a claim upon which relief may be granted against the named Defendant.

## SECOND AFFIRMATIVE DEFENSE

Plaintiff fails to states a claim for retaliation as the Plaintiff cannot establish that he engaged in any protected activity.

## THIRD AFFIRMATIVE DEFENSE

Plaintiff fails to state a claim for intentional infliction of emotional distress as the Plaintiff's is unable to establish extreme and outrageous conduct by the defendant, intent to cause or a reckless disregard of the probability of causing emotion distress, that plaintiff suffered severe or extreme emotional distress or the actual and proximate causation of the emotional distress by Defendant's outrageous conduct.

## FOURTH AFFIRMATIVE DEFENSE

Plaintiff may have failed to exhaust his administrative remedies for some of his claims.

## FIFTH AFFIRMATIVE DEFENSE

The Defendant's conduct and actions toward Plaintiff have been in good faith with legitimate and reasonable belief that his actions did not violate any laws or any of the Plaintiff's rights.

## SIXTH AFFIRMATIVE DEFENSE

The Defendant did not engage in any willful or egregious conduct toward Plaintiff.

## SEVENTH AFFIRMATIVE DEFENSE

The Plaintiff failed to mitigate his damages, if any.

**WHEREFORE,** the Defendant respectfully pray that this Court grant the following relief:

a) Dismissal of the Plaintiff's Complaint on its merits;

b) An award of costs, fees and attorney's fees as allowed by law; and

c) Such other relief as the Court deems just and equitable.

Defendant request a trial by jury.

Dated this 22nd day of November, 2024.

Respectfully submitted,

**Defendant Kevin Curtis.**

By: */s/ Lynne. M. Mueller*

One of it Attorneys

Lynne M. Mueller
LITCHFIELD CAVO LLP
303 West Madison Street
Suite 300
Chicago, Illinois 60606
(414) 488-1837 (Mueller)
Fax: 312-781-6630
Mueller@LitchfieldCavo.com

**<u>CERTIFICATE OF SERVICE</u>**

       I certify that on November 22, 2024, I electronically filed the foregoing document with the Clerk of the Court suing the CM/ECF system, which will send notification of such filing to all counsel of record as provided below:

Ethan G Zelizer
HR Law Counsel
29 S. Webster St., Suite 350-C
Naperville, IL 60540

Jonathan William Garlough, Esq.
Foley & Lardner
321 North Clark Street
Suite 2800
Chicago, IL 60654

Molly M. Jones, Esq.
Shelby M Broaddus, Esq.
Wick Phillips Gould & Martin, LLP
3131 McKinney Avenue
Suite 500
Dallas, TX 75204

                                        */s/*  Lynne M. Mueller